_JjAMY, Judge.
The issue presented on this supervisory writ is whether the trial court clearly abused its discretion in awarding legal custody of a minor child to a non-parent rather than to the child’s natural parent. For the reasons which follow, we reverse the trial court’s award of custody and remand with instructions.
DISCUSSION OF THE RECORD
Michelle Lea Clark and Brian Scott Klei-don were married on October 11, 1994. Michelle and Brian were living in Jacksonville, Florida where Brian was stationed in the United States Navy. Michelle gave birth to a girl, Arielle Michelle Kleidon, on November 1, 1994. However, at the end of April 1995, Michelle left Brian and moved back home to live with her mother, Barbara M. Clark, in Simmesport, Louisiana. Michelle also brought Arielle to her mother’s house.
On June 7, 1996, Michelle and Brian were granted a judgment of divorce. Also, in that judgment of divorce, Michelle was granted custody of Arielle. However, on June 21, 1996, Michelle was killed in an automobile accident. Four |2days later, Barbara M. Clark filed a “Petition For Sole Custody” of Arielle. Specifically, Barbara alleged:
*889 Petitioner, BARBARA M. CLARK shows that she has a stable homelife, further that she is involved with the daily-activities and caring for the child and has been so involved even when MICHELLE LEA CLARK KLEIDON was living.
Petitioner, BARBARA M. CLARK further avers that she has a loving relationship with this child, the child is only 19 months old and has always lived with the grandmother. There is a loving bond between the grandmother and the minor child, ARIELLE MICHELLE KLEI-DON.
Petitioner, BARBARA M. CLARK further avers that it is in the best interest of the minor child, ARIELLE MICHELLE KLEIDON that she be granted custody subject to visitation rights in favor of the father, BRIAN SCOTT KLEIDON.
The grandmother avers that she will foster a loving relationship between the child and the father BRIAN SCOTT KLEIDON.
The petitioner further avers that the father is in the military and is stationed in Florida and further has received orders to be “shipped out”.
A hearing on the merits was held on August 9, 1996. The trial court rendered judgment on August 22, 1996, granting Barbara M. Clark, the maternal grandmother, sole custody of Arielle Michelle Kleidon. Further, the trial court granted Brian Scott Klei-don visitation privileges under the following conditions: (1) no overnight visitation until ordered by the court; (2) all visitation must take place in Avoyelles Parish, Louisiana; (3) Brian Scott Kleidon must give Barbara M. Clark ten day notice prior to visitation; and (4) visitation is to take place from 9:00 a.m. until 5:00 p.m. on Saturday and from 9:00 a.m. until 5:00 p.m. on Sunday.
In response to the trial court’s judgment, Brian filed for supervisory writs with this court, alleging that the trial court “erred in not establishing any compelling need of the child sufficient to justify deprivation of the surviving parent to his paramount right to custody.” The precise issue that we are asked to address is whether the trial | ¡.court erred in granting custody of Arielle to Barbara M. Clark, a non-parent, instead of to Brian Scott Kleidon, a parent.
LAW
La.Civ.Code art. 133, which became effective on January 1, 1994 and is applicable in the present case, states:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
The Revision Comments to Article 133 provide in part that:
(a) This Article reproduces the relevant portions of the source provisions, former Civil Code Article 131(A) & (B) (1992), without substantial change. The redundant dual test for divesture of parental custody found in the source article has been replaced with a similar, but briefer, provision.
(b) The requirement of proof that parental custody would result in “substantial harm” to the child that is stated in this Article represents a change in the terminology of the test for divestiture of parental custody. The new language, which is not entirely new to Louisiana law (Pittman v. Jones, 559 So.2d 990, 993 (La.App. 4th Cir.1990); In the Matter of Stewart, 602 So.2d 212, 214 (La.App. 3d Cir.1992)), has been adopted because it represents an efficient means of giving effect to a parent’s paramount right to custody of his child as against any nonparent. The primacy of that parental right was recognized by the Louisiana jurisprudence long before it was given effect by the legislature in 1982. See prior C.C. Art. 146 as amended by 1982 La.Acts, No. 307, Wood v. Beard, 290 So.2d 675 (La.1974). Prior to the 1982 introduction of the two-part statutory test that parental custody be shown to be “detrimental” to the child and that divestiture be “required to serve the best interest of the child,” the courts had followed the jurisprudential formula: “the parent ... *890 may be deprived of ... custody only when (he) had forfeited his or her right to parenthood, ... is unfit, or ... is unable to provide a home for the child.” Deville v. LaGrange, 388 So.2d 696, 697-98 (La.1980). See also Jones v. Jones, 415 So.2d 300 (La.App. 2d Cir.1982) (Use of best interest standard was improper in custody contest between parent and nonparent). That jurisprudential language was of course substantially different from the statutory language adopted in 1982, and at least one court accordingly held that the 1982 enactment had changed the law, giving the courts “more freedom or latitude to pursue the goal of insuring that the best interest of the child is served in resolving custody disputes between |4parent and nonparent litigants.” Boyett v. Boyett, 448 So.2d 819, 822 (La.App. 2d Cir.1984). A similar argument (although most likely to the opposite effect) could be made again under this revision, which does indeed change the terms of the relevant test significantly. However, it is clear that the heart of the parental primacy concept, the rule that a nonparent always bears the burden of proof in a custody contest with a parent, was not disturbed by the prior statutory enactment, and likewise has not been affected by this revision. See Love v. Love, 536 So.2d 1278 (La.App. 3d Cir.1988); Boyett v. Boyett, supra; Deville v. LaGrange, supra.
“The rights of parents to the companionship, care, custody and management of their children is a fundamental liberty interest warranting great deference and protection under the law.” State In The Interest of D.D., 94-1404 (La.App. 3 Cir. 2/15/95); 650 So.2d 447, 449, citing Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Parents enjoy the paramount right of custody of their children and may be deprived of that right only for compelling reasons which must be expressly determined and supported by convincing evidence. In Re Custody Of Landry, 95-141 (La.App. 1 Cir. 10/6/95); 662 So.2d 169; Lingo v. Kelsay, 94-1038 (La.App. 3 Cir. 3/1/95); 651 So.2d 499; In Interest of CLS, 94-531 (La.App. 3 Cir. 11/2/94); 649 So.2d 532. In a custody contest between a non-parent and a parent, when possible, the child should remain in the natural parent’s custody to maintain family unity and help the child identify as part of the natural family unit. State In Interest of Sylvester, 525 So.2d 604 (La.App. 3 Cir.1988). The non-parent bears the strict burden of proving by convincing evidence that the parent’s custody would result in substantial harm to the child. Creed v. Creed, 94-268 (La.App. 3 Cir. 12/21/94); 647 So.2d 1362. The non-parent’s burden of proof goes beyond just a mere affirmative finding that the best interests of the child would be served by placing custody of the child with the non-parent; rather, the non-parent has to prove that the grant of custody to the parent would be detrimental to the child. Love v. Love, 536 So.2d 1278 (La.App. 3 Cir.1988). The trial court’s determination in a child custody case is entitled to jsgreat weight on appeal and will not be disturbed unless there is a clear abuse of discretion. Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96); 676 So.2d 619.
Barbara M. Clark, who is 54 years old, testified that she was the maternal grandmother of Arielle and that she lived in Simmesport, Louisiana in a four bedroom, four bathroom house with a “huge playroom” and a “fenced in play area for the kids.” Barbara testified that her daughter, Michelle, married Brian on October 11, 1994, while she was pregnant with Arielle. Barbara also testified that Brian was married to Joy Kleidon at the time that Arielle was conceived, but that Brian subsequently got a divorce from Joy before his marriage to Michelle. Barbara further testified that Michelle and Brian were living in Jacksonville, Florida, where Brian was stationed in the United States Navy. Barbara stated that, at the end of April 1995, Michelle and Arielle came to live with her in Pensacola, Florida after Michelle had separated from Brian. Barbara also stated that Michelle and Arielle lived with her in Simmesport, Louisiana for approximately one year before Michelle died in the automobile accident.
Barbara testified that Michelle and Brian were granted a judgment of divorce in Avo-yelles Parish, Louisiana on June 7, 1996. *891 Barbara noted that MicheUe was granted custody of Arielle in that judgment of divorce. Barbara then stated that, two weeks later, Michelle was killed in an automobile accident. Barbara further stated that Arielle was twenty-one months old at the time of the custody hearing.
Barbara testified that, during the five months that Michelle and Arielle lived with Brian, Michelle took care of Arielle. Barbara stated that after the divorce, Brian did not come to see Michelle and that Brian had not seen Arielle since Christmas 1995. Barbara acknowledged that Brian did see Arielle at Michelle’s funeral. When Barbara was asked if anything unusual happened, she replied:
|6Well, he tried to pick her up and communicate with her; she was afraid of him, cause she doesn’t know him.
Barbara testified that Brian left Arielle with her after he had left Michelle’s funeral to go back to Jacksonville, Florida.
Barbara testified that her oldest daughter, Delores, and her other granddaughter, Jennifer, five with her in the house in Simmes-port. Barbara stated that her two brothers and one sister live near her house. Barbara further stated that Michelle’s father, William Clark, died in an oil-field accident and left Michelle a one million dollar inheritance. Barbara noted that Michelle was receiving about $3,000.00 per month from her inheritance trust fund to take care of herself and Arielle. Barbara indicated that Michelle and Brian had signed a pre-nuptial agreement regarding Michelle’s inheritance money. Barbara testified that Arielle will now receive Michelle’s trust fund money. At that point, Barbara expressed concern that, if Brian received custody of Arielle, he would have access to this money. Barbara noted that she is financially capable to taking care of Arielle without touching her trust fund. In fact, Barbara stated that she would invest Arielle’s trust fund and that Arielle would not begin receiving money until she was approximately 17 years old.
When Barbara was asked about her relationship with Arielle, the following colloquy took place:
Q. Now, I want you to tell me about your homelife [sic]. What is your home life like?
A. Well, we basically do the same thing everyday. She (Arielle) gets up about the same time, around 8:00 o’clock; we watch Barney; she has breakfast; we play, and then she has play time by herself, so I can do things; we have lunch; she takes a nap; she plays with my granddaughter (Jennifer), or other kids who may come by.
* ⅜ ‡ ⅜ ⅜ ⅜
|7Q. What is your relationship with this child?
A. Well, we have a very good relationship; she loves me and trusts me.
⅜: ⅜ ⅜ ⅜ ¾: ⅜
Q. Is there a show of affection between the two of y’all?
A. Yes.
Q. And, explain that.
A. Well, she loves me; she kisses me; I hug her; I take care of her; I bathe her; I fix her food; if she doesn’t eat what I fix, I fix something else; I mean, that’s love.
⅜ ⅜ ⅜ ¾: ⅜* ⅜
Q. Now tell me about bathing, grooming and dressing the child.
A. She loves to take a bath; she bathes every night; she has a bubble bath; and we always dress her for the day.
Q. What about her hair?
A Comb her hair; put barrettes in it.
Q. Who buys and cleans and cares for her clothes?
A. I do.
Barbara testified that other family members spend time with Arielle and that her home is very stable and comfortable for Ar-ielle. Barbara stated that she is in good physical and mental health and that she is capable of taking care of Arielle. She also noted that she would encourage a close relationship between Arielle and her father, Brian. Finally, when Barbara was asked why Arielle would suffer substantial harm if placed in the custody of Brian, she replied:
*892 Well, it would, because she doesn’t know him. And, you just don’t do that to a child. I know he’s the father, but she has rights, too.
William J. Clark, Michelle’s brother, testified that his mother, Barbara, helped take care of Arielle when Michelle was living. William stated that he has a “loving ^relationship” with Arielle and that she knows him very well. William also stated that Arielle calls him “Bubba.” William further stated that his mother “takes care of Arielle totally” and that she provides a stable and adequate environment for Arielle. William noted that Arielle and Michelle lived with Brian for only five months. William testified that he calls his mother at least two times a day and tries to visit her house at least once a month, depending on his work schedule. Finally, when William was asked why he felt that Arielle would suffer substantial harm if placed in the custody of Brian, he replied:
Because she considers him a stranger because he’s just never taken an opportunity to come and visit her. He’s just never really been a father to her at all.
Brian Kleidon, who is 24 years old, testified that he met Michelle when he was still married to Joy Kleidon. Brian stated that he met Michelle in Pensacola, Florida through mutual friends. Brian admitted that Arielle was conceived while he was still married to Joy; however, he stated that he then divorced Joy to marry Michelle because Joy did not want to have children. Brian stated that he married Michelle on October 11, 1994, and that Arielle was born on November 1, 1994. But, he acknowledged that he and Michelle separated in April 1995. When Brian was asked the kind of relationship he had with Arielle while they lived together, he replied:
When Ariel [sic] lived at home with me, she was basically a typical daddy’s girl. I rocked her every night, put her to bed, fed her and bathed her, changed her diapers, took care of her to my extent then and, when Michelle went to her mother’s house, due to my sea schedule and my constant deployment and preparation for deployment — I don’t have a lot of time when we get ready for deployment to ... they don’t give you a lot of leeway for days off so I didn’t have ample time to run back and forth all the way to Louisiana to try to make arrangements to see Ariel [sic] so when I did I could, but if I couldn’t get time off I just couldn’t get time.
Brian testified that he saw Michelle and Arielle in June 1995 when he drove to Louisiana to visit them after he had undergone knee surgery. He stated that he 19stayed at Barbara’s house and that he played with Arielle and rocked her to bed at night. Brian further stated that the next time that he saw Arielle was in October 1995 when Michelle and Arielle came to Pensacola, Florida for a few days. Brian testified that Michelle came in October because it was their anniversary. He also testified that he, Michelle, and Arielle stayed at his mother’s house during that visit. Brian acknowledged that the last time he visited with Arielle before Michelle’s funeral was Christmas 1995.
Brian testified that he then saw Arielle at Michelle’s funeral in June 1996. Brian stated that he decided to leave Arielle with Barbara after Michelle’s funeral. When he was asked to explain this decision, he responded:
I spoke with Michelle’s brother William and he was explaining to me that Ariel [sic] was basically the only thing that was holding Barbara together and keeping her somewhat sane through all this and, you know, I had compassion for her and I explained to him that I would leave Ariel [sic] there for a short period of time. And that’s when I had to return at that time to go back and handle things with the Navy.
Brian testified that he is in the United States Navy and that he is stationed in Jacksonville, Florida. Brian stated that he is in aviation and that, prior to Michelle’s death, he was often deployed to sea. However, Brian testified that, after Michelle’s death, he had “full interest” in getting custody of Ar-ielle so that he made “arrangements” with the Navy to be removed from sea duty and that his next “billet” would be shore duty. Brian also stated that he then rented a four bedroom, two bathroom house and has made arrangements for Arielle’s care while he is at work.
*893 Brian acknowledged that before entering the Navy he had been in some “criminal trouble” in Chicago for getting into a fight. Brian stated that there was a “list of charges” but that he received six months unsupervised probation. Further, Brian admitted that he got into some trouble in Florida for making false statements hoto get a driver’s license. Brian noted that he made false statements about his age so that he could get into night clubs.
Brian testified that he is financially stable and that he has the capacity to give his daughter love, affection, spiritual guidance, and necessary medical care. Brian further testified that he knows how to cook; that he can bathe and groom a child; that he can purchase clothes for a child; that he can discipline a child, if needed; and that he can teach a child basic skills of reading, writing, and arithmetic. When Brian was asked if he would be willing to work out agreements with Barbara if he received custody of Ar-ielle, the following colloquy took place:
Q. Would you have a problem with the child having a close and continuing relationship with Michelle's mother?
A. I do not have a problem with that. She loves her grandmother.
Q. And you would foster that?
A. Yes.
Q. And you would make arrangements to help provide transportation?
A. Sure, yes.
Q. And do anything to continue that relationship.
A. Yes. That’s her grandmother. I know she loves her and I wouldn’t separate them and I know that she loves her Granny and her Granny loves her.
* * ⅜ * * *
Q. Would you be willing to enter into a transitional custody change rather than an abrupt custody change if the court felt that would be in Ariel’s [sic] best interest?
A. If the court was in the position to offer that, yes.
Q. Would you also be interested in entering into an agreement that you would protect the child’s trust fund?
A. Yes.
InRichard Harris, a student at Michigan State University, testified on behalf of Brian. Richard testified that he knew Brian when they were in the Navy together working together in May Port, Florida. Richard stated that Brian moved through “the ranks quite rapidly” and that Brian was respected in the Navy. Richard stated that he saw Brian with his daughter when they served in the Navy. When asked the type of relationship Brian had with his daughter, Richard stated:
I would say a very loving and caring one. I can’t remember a time seeing Mr. Kleidon without or with ... being in arm’s reach of the child. I would say all the normal fatherhood things, changing diapers, feeding, always wanting to be a part of the child’s life. He carries a photo, a recent one that gets changed all the time, he’s more than willing to show anybody in the squadron that this ... He’s very proud to be a father.
Neta Kleidon, Brian’s mother, testified that she has seen Brian with his daughter a “number of times” and that he is a good father. Neta stated that Brian loves his daughter and that he would play with her, feed her, and bath her. Neta opined that it would not be harmful to Arielle if Brian received custody of her. Neta stated that she lives in Pensacola, Florida and that she is approximately six hours away from Brian in Jacksonville.
The trial court, after hearing all this evidence, stated in part that:
Very well. Normally custody decisions are very hard for this court. In this instance, it’s not. Mr. Kleidon has come forward and he’s in the military and he says that he has an arrangement of permanent shore duty. He has not produced any proof of that. Given his job title, job description, it’s a very important position which requires deployment especially in times of crisis, requiring him to be gone for long periods of time. Even if he had permanent shore duty, military life itself is *894 unstable in the fact that he can be transferred from one duty station to another. He’s obviously a very efficient career-minded Navy person and he’s to be commended for that. However, that does not provide a stable environment for a child. The grandmother has provided a good, stable, moral home. She’s probably the only mother that the child knows or will ever know. To remove this child now would be of such great trauma to the child because we would be removing her not only from her mother figure but from every other friend and relative which she has to surround her and aid her through childhood. She has_[i2lived with her grandmother practically all of her life. The court feels that to remove her at this time would be far too traumatic for the child and would be in fact devastating to the child.
After a thorough review of the record, we conclude that the trial court clearly abused its discretion in awarding sole custody to Barbara, a non-parent, rather than to Brian, a parent. We do not find that Barbara proved by convincing evidence that Brian’s custody would result in substantial harm to his daughter. The only proof Barbara offered regarding this issue were opinions that it would be detrimental to Arielle to remove her from a house where she is comfortable and into a house with her father whom she has not had close ties with in the previous months. However, we found this same type of argument to be without merit in Tutorship of Primeaux, 574 So.2d 543 (La.App. 3 Cir.1991) (Trial court’s finding that it would be detrimental for child for father to have custody was clearly wrong where the only basis for this finding was that it would be detrimental to child’s development to force him from a home in which he was comfortable and into a home with his father with whom he did not have close ties during recent years).
We understand the need for caution and prudence by the trial court in delivering custody into such an untried situation. However, we note that the trial court has the inherent power to determine a child’s best interest and to tailor a custody order, including visitation, in a manner that minimizes the risk of harm to the child. Evans v. Terrell, 27, 615 (La.App. 2 Cir. 12/6/95); 665 So.2d 648, writ denied, 96-0387 (La.5/3/96); 672 So.2d 695; Oglesby v. Oglesby, 25, 974 (La.App. 2 Cir. 8/17/94); 641 So.2d 1027. Accordingly, all of the reasonable concessions that the father, at trial, seemed so willing to make, may well be entertained by the trial court on remand.
_[i3DECREE
For the foregoing reasons, we reverse the trial court’s judgment. Further, we remand this ease to the trial court to render a custody decree consistent herewith. Finally, costs of this appeal are assessed against Barbara M. Clark.
REVERSED AND REMANDED WITH INSTRUCTIONS.