11WOODARD, J.,
dissenting.
I respectfully dissent from the majority view and urge a reversal for the following reasons.
This case, and the resulting judgment, are driven by emotion, innuendo, unsupported supposition, and personality clashes — not fact or law.
For the most part, Ms. Hair’s parental rights were terminated based on Mark’s input. He never testified, but his “story” was tunneled to the court through OCS and Dr. Post, who used it as the basis of his opinion, that Ms. Hair’s parental rights should be terminated, in spite of astounding evidence casting serious doubt on Mark’s credibility. At the State’s direction, Dr. Stuart Samson evaluated Mark. He thought him to have a: “Delusional disorder NOS vs Paranoid disorder vs Share delusional disorder vs Thought disorder psychosis.” Dr. Middleton, the psychologist Dr. Samson referred Mark to for evaluation, believed him to have a psycho sexual disorder. The trial court declared that it found Mark to be extremely manipulative and unreliable. Nevertheless, it relied, principally, on Dr. Post’s opinion, based on Mark’s “tales,” to make its decision to terminate Ms. Hair’s parental rights. Thus, by its own determination, the court used unreliable “evidence” as the basis for its judgment. This is manifest error.
| j>Even though the standard of proof is “clear convincing evidence,” the holding in this case is based on impressions that are not supported by facts in the record. Below, I have attempted to address every one of them, as well as the fallacies of the so called “case plan” by which Ms. Hair was judged and determined to be unfit because of her lack of compliance.
The overwhelming weight of competent evidence is clear and convincing that Ms. Hair is not psychotic, does not need medication, is not a danger to her children, and is an exemplary mother.
The surface view, upon which termination is based and which the majority condones, portrays her as a “crazy” woman who has had a long standing, deleterious mental problem and who has exhibited all sorts of bizarre.behavior, for no reason; a contemptuous woman who cares more about herself than her children and who presents a danger to them. Thus, Ms. Hair is unfit to love and care for her children, and her parental rights should be terminated.
A deeper look — a look at the facts — tells a very different story. The facts in the record disclose a professional woman, who single-handedly adopted, loved, cared, and provided well for two children, one (E.H.), a biracial child, since birth, and the other (Mark), a physically impaired child with severe emotional ailments, relegated by the State to be mentally retarded^ who came to her at the age of five. At the same time, Ms. Hair took good care of her own elderly, invalid mother. It must be noted that she was willing to take on the challenge and responsibility of caring for an older child with severe handicaps. She undertook a very difficult task and was a devoted daughter and mother, who developed her children’s potential.
Regarding this same “crazy” woman the majority describes, the majority relates facts from the record, which essentially *760 depict her situation before the State became involved:
1. Ms. Hair addressed Mark’s vision problems;
2. She enrolled him in various extracurricular activities, including Boys Scouts, Junior Deputies, dance classes, and piano lessons;
3. In various evaluations performed on Mark, he has been described as having average intelligence and the ability to obtain a college degree.
|a4. E.H. has been described as a happy, well-adjusted child; the record contains no indication that she suffers . from any serious problems.
Additionally, the record discloses that Dr. Sylvia Claire Boyer, the Hair’s family doctor since, at least 1982 regularly saw Mark and E.H. and reported:
On every visit that I- have seen the children, they were well dressed and clean and if they weren’t ill at that time, as Mark frequently had tonsil infections, but the little girl was always happy. I had an occasion to see them outside of the office on one occasion and she was very playful and I had no indication that there was anything wrong with that[J
[[Image here]]

I have never seen any, no evidence of neglect or physical abuse.

(Emphasis added.)
Ms. Karen Williams was Ms. Hair’s neighbor for two and one-half years shortly before.the occurrence of the events sub judice. She testified that she and her children interacted, significantly, with Ms. Hair and her children and that she had never seen any sign of abuse. When asked whether she ever had any reason to be concerned for Opal’s children’s welfare for any kind of abuse, she replied: “Oh, no. Quite the contrary. They seemed to always have everything, and they always seemed to be doing things together a lot.”
Mr. Larry Wayne Cuppy, Ms. Hair’s supervisor at the Lake Charles Waste Management facility for four years, testified that she was a very good and methodical employee. He stated that her position entailed important responsibilities, which consisted of approving waste for their facility, and that she had not displayed any signs of being delusional. He asserted that if she had displayed any signs of delusions, he would have removed her.
Although, sometimes, a trial court is privy to information which does not make it into the record, our appellate review must focus, only, on that which is in the record. And there is not even a scintilla of evidence in the record to suggest that Ms. Hair has ever harmed, attempted to harm, or would harm her children, other than unsubstantiated hearsay from Mark, whom one of the State’s doctors thought was ^delusional. In fact, Ms. Hair’s troubles with the State began because she was trying to protect her children and elderly mother.
Since the State maintains that Ms. Hair’s “mental problem” has been long standing, how is it' possible that she went from being such a loving, caring, selfsa-crificing, very responsible woman to becoming one who is unworthy and incapable of raising children? In search of the answer to this puzzling, troubling question and whether, indeed, Ms. Hair is unfit, it is necessary to review the record in its entirety, separate fact from fiction and unsubstantiated impressions and conclusions, and evaluate these facts in the context in which they arose, not in a vacuum.
Triggering .Events/Burden of Proof
The majority accurately reviews the facts leading to Ms. Hair’s hospitalization at Lake Charles Memorial Hospital (LCMH) on January 25, 1996, when she was removed from her home, but overlooks most of the germane, favorable ensuing facts. The most important initial facts concern the triggering events surrounding the State’s earliest removal of the children from Ms. Hair’s home and its refusal to return them after it was determined that *761 Ms. Hair was not psychotic and was not a danger to herself or to her children, as the State had presumed. The event triggering her current predicament, occurred when she tried to carry out her mother’s wishes. Namely, Eva Mae disliked a home health nurse, who had come to their house to administer to her. She asked Ms. Hair to keep the nurse from returning. Thus, when the nurse appeared at the door, Ms. Hair would not let her enter the house. What followed was an anonymous complaint to OCS, stating fears that Ms. Hair was insane. Ultimately, an OCS worker appeared at her door with police officers, who immediately removed her children from her care and took her to LCMH for evaluation. There, Dr. Murphy, a psychiatrist, kept her under his care for four days. At discharge, he reported that she did not present symptoms of paranoid schizophrenia, paranoid disorder, or atypical psychosis. He did not prescribe any medication, and he found her not to be dangerous to herself or to others, which, of course, would include her children.
This, should have been the end of the story, and Mark and E.H. should have been returned to their mother’s custody. But despite the fact that the complaint, which was the basis for the State’s intervention, proved invalid, the State refused to return her children to her. It stated in its case plan that OCS had “validated additional 1 .¡maltreatment by Ms. Opal Hair on both children.” However, the State did not note any specifics on the plan and never entered into the record a single fact or proof of the alleged maltreatment or, even, the source of the information. From that point, Ms. Hair’s life, as well as that of her children and mother, spiraled downward, falling like dominos. Ultimately, Ms. Hair wound up in jail and her children in a foster home. One of them tried to commit suicide. And, her mother was forced to go to a nursing home.
Subsequently, without any factually supported justification in the record, the State inappropriately manipulated the custody of Ms. Hair’s children. This caused her to be unjustly stripped of her fundamental right to rear E.H. and deprived her daughter of her mother’s continued love and support, with little more than third-party hearsay and with total indifference for our 1996 ruling in Clark v. Kleidon,[1] In Clark we stated, in relevant part, that:
The rights of parents to the companionship, care, custody and management of their children is a fundamental liberty interest warranting great deference and protection under the law. Parents enjoy the paramount right of custody of their children and may be deprived of that right only for compelling reasons which must be expressly determined and supported by convincing evidence. In a custody contest between a non-parent and a parent, when possible, the child should remain in the natural parent’s custody to maintain family unity and help the child identify as part of the natural family unit.
(Citation omitted. Emphasis added.)
Indeed, Ms. Hair’s parental right has been ranked as one of the most coveted, rising to the level of a constitutional right, on both federal and state fronts.[2] To divest a parent of this right requires proof by “clear and convincing ” evidence. Yet, in the instant case, this standard was completely ignored. The “evidence,” primarily used to support this judgment, does not even come close, and the trial court’s decision is replete with manifest errors.
| ¿The Child’s Best InteRest
When considering whether parental rights should be terminated, the “best interest of the child” is paramount[3] and *762 appropriately operates as the underlying premise for the majority’s decision to affirm permanent removal of E.H. from Ms. Hair. However, the State has the burden of proving, by “clear and convincing ” evidence, that E.H-’s best interest would be served by doing so and by placing her in the present foster home. Attempting to satisfy its burden of proof, the State offers, merely, its conclusion that this is so because, as it says, the child has bonded with the new foster parents, has been with them so long, and is doing well. But, it supplies no competent evidence, no factual support, for any of these conclusions, save the length of time the child has been with the foster parents. In fact, we know virtually nothing about them. Additionally, counsel for the State admitted in oral argument that foster parents are not subject to psychological profiling. Presumably, none was required of Ms. Hair, about whom the State now complains is harmful to these children. Therefore, it is difficult to understand how removing E.H. to another’s care, whom- we know nothing about, is clear and convincing evidence that the “best interest of the child” will be served, unless we accept, on blind faith, that OCS, not courts or parents, have the monopoly to determine what is best for the children in our State.
Furthermore, not only do these unsupported conclusions regarding best interest fail to satisfy the State’s burden of proof, but they are also unreliable. As with E.H., the State represented that Mark was “doing well” in the foster care in which he was placed, after his removal from Ms. Hair. However, the facts in the record reveal that he had tried to commit shicide, when he slashed his throat and face, and had run away several times.
Finally, implicit in the legislative and jurisprudential mandates is the notion that it is in the child’s best interest to be with her parent. There is no greater or more important bond than that between a child and a parent. And, it is not in E.H.’s best interest to ignore that invincible bond which she formed with her mother, from infancy to, at least, the age of five — her formative years. Normal five-year-olds are not unconscious. They know who their mother and father are and depend upon them emotionally, as well as physically. It must be presumed that, at five, E.H. did not know |7the distinction between biological and adoptive mother. For her, Opal Hair is the only mother she has ever known. Children do not forget their mother or father. E.H. must suffer tremendous emotional pain and anxiety at what must feel like her mother abandoned her. Moreover, while under her mother’s care, E.H. developed very well and has been consistently described as “a happy, well-adjusted child” who does not suffer “any serious problems.” It appears that her best interest has been served remarkably well by her mother.
Then, one may ask how it is possible that our legal system and its procedural safeguards did not protect a person like Ms. Hair from being terminated as a parent. Without underestimating the majority’s task in reconstituting this factually intricate case, I submit that the majority erred in deferring to the trial court’s findings of fact, when they were unreasonable, in light of the record, and not based on competent facts in the record.
GROUNDS FOR TERMINATION
In the case sub judice, under La.Ch. Code art. 1015(5), the State had to prove, by clear and convincing evidence, that Ms. Hair had not: 1) substantiallg complied with the case plan for services; AND, 2) that there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future. Additionally, when an Article 1015 termination is claimed on the basis of a parent’s mental illness, the fact that the parent is mentally ill, by itself, is insufficient to warrant termination of parental rights.[4] Indeed, the mental deficiency must negative *763 ly affect the parenting abilities.[5] In the case sub judice, for the following reasons, the State did not prove, by clear and convincing evidence, any of the mandated statutory and jurisprudential requirements.
One of the plan’s predominate precepts calls for medication and specialized medical treatment for an alleged psychotic disorder. OCS workers are not qualified to diagnose, treat, prescribe medication for, or evaluate psychotic mental disorders. This requires a health care professional. The only professional competent and legally qualiñed to do all four is a psychiatrist. Thus, it stands to reason that, in order for the | «State to prove, by “clear and convincing ” evidence, the ground for termination of parental rights dictated by La.Ch.Code art. 1015, requires it to present clear and convincing medical testimony that Ms. Hair had such a psychotic disorder and that medication was warranted for treatment. Otherwise, it cannot be said that she did not comply with this part of the plan. In other words, if she did not have a psychotic disorder or a need for medication, this requirement of the plan was moot.
Substantial Compliance with OCS’ Case Plan
The plan reflects the law,[6] requiring that the State institute a plan, which will achieve the goal of reuniting Ms. Hair’s family, as well as requiring that it fulfill its duty to take whatever action is necessary to remove or reduce all barriers to that goal. As a party to the plan, the State also has an obligation to comply with it.
Thus, when evaluating Ms. Hair’s “substantial compliance with the case plan” under Article 1015’s first requirement, her actions must be evaluated, not only in the context of the appropriateness of the plan, but also in the context of the State’s actions and inactions. Further, in order to determine whether the State has met its burden of proving, by clear and convincing evidence, that Ms. Hair has not complied with the plan, we must examine each provision of the plan, her compliance, and if none, the reason. Moreover, it goes without saying that, in order for the plan to be a legitimate instrument to achieve the State’s mandated goal of reuniting her with her child and in order for Ms. Hair to be expected to comply, the plan must be reasonable and based in reality.
At the outset, it must be noted that, while the State represented to the trial court and on the plan under the heading, Case Plan Assessment, Compliance/Results, that it had complied with its obligations under the plan, in fact, the record shows that it did not. It not only refused to remove or reduce any barriers to the goal of reunification, as required, it also admitted in court that it would not even address Ms. Hair’s legitimate concerns.
The instant plan imposes upon Ms. Hair the following requirements:
|91. Cooperate with OCS workers by allowing them to visit, keeping them informed of her living arrangements, income and resource changes, and household composition.
2. Cooperate with foster care workers, that is, refrain from an aggressive attitude toward them.
3. Refrain from going to the foster homes and harassing foster families.
4. Display nurturing and earing behavior towards Mark and E.H.
5. Actively participate in psychiatric evaluation to determine the need for medication.
6. Once she stabilizes on medication, she needs to understand her family situation and her role and responsibility.
7. Once OCS allows her to visit again with Mark and E.H., she needs to maintain her relationship with them.
*764 8. She needs to develop positive disciplining method for her children.
The first and second provisions of the plan require that Ms. Hair cooperate with OCS and foster care workers. Note, however, that implicit in the plan is the requirement that the State, also, must cooperate with Ms. Hair for the best interest of the child. In essence, the State and Ms. Hair are to work together as a team with a common goal — reunification of mother and child. Mutual cooperation is the umbrella that covers all provisions in the plan and is the plan’s linchpin.
The State knew from the outset that there was a catastrophic barrier to it being able to enlist Ms. Hair’s cooperation. That barrier is her distrust of OCS, which is reasonable based on the information she had. Her son, Mark, told her shortly after he came into her custody that he had been sexually abused in the police station and other places and was forced to participate in satanic rituals in his former foster home. He named individuals from OCS and police departments as participants in the abuse. Ms. Hair acknowledged that, at first, she thought maybe he was exaggerating, but felt that she should, at least, report the information. She did. Jefferson Davis law enforcement brought in Mr. Brooks Fleig, a former law enforcement chaplain and a satanic ritual expert. He testified at the termination hearing that he investigated Mark’s story and found that it was credible. In fact, he stated that indictments were . forthcoming, but, | msuddenly, he was told to go home. Ms. Hair was not provided with any further information.
The State introduced nothing in the record to rebut this testimony, nor did it attempt to prove that it was groundless. In fact, the State does not rebut or prove untrue any of the subsequent events, which Ms. Hair relates as being part of a conspiracy against her and Mark.
Under these very unique, but serious circumstances, the State should have adjusted the plan to remove or reduce this barrier to reunification. No parent would want, or should be expected, to cooperate with someone whom she believed, or even suspected, had sexually abused her child. Moreover, Ms. Hair’s suspicions were validated. There,were many, but one option for OCS was to remove itself from direct contact with her and ask the court to set up an alternative mechanism. There are several competent, court appointed professionals with whom Ms. Hair did cooperate.
However, instead of mending the gorge, the State deepened it. State workers admitted that they never addressed Ms. Hair’s concerns. One conceded that they did not even keep her informed of E.H.’s progress in school, or otherwise, because Ms. Hair had not cooperated with the agency. She explained that her policy was to cease cooperation with a parent if the parent did not cooperate totally with her. Further, the State compelled her to visit with her children in the police station, where Mark claimed that he had been molested,[7] even though Ms. Hair requested that they be allowed to visit in a more “children friendly” and neutral location, like McDonald’s. This was, obviously, a very reasonable and caring request made by a mother who wanted to protect her children against further distress or harm. She was trying to cooperate with the State. However, instead of demonstrating respect and compassion for her concerns and trying to work with her to reunify the family, OCS refused to make the slightest concession. Instead, throughout, the State insisted on trying to bang a round peg into a square hole, and when it failed, it gave up the reunification goal and blamed the failure on Ms. Hair’s lack of cooperation, even though it did not abide by its own responsibilities under the plan. .It represented on the plan and to the court that it had complied with its obligation under the plan and that, only, Ms. Hair had not *765 complied at all. The record reveals that is not accurate.
InOCS’ “plan” was untenable under the circumstances and destined Ms. Hair to failure. In sum, it performed like a fireman fueling a fire instead of fulfilling its duty to extinguish it. As a result, Ms. Hair should never be made to pay the dear price which OCS commands and which the majority delivers. Ms. Hair has paid, and still is paying, amply for a situation which she did not entirely create.
Concerning the case plan’s third provision, “going to the foster homes and harassing foster families,” Ms. Hair would drive by E.H.’s foster parents’ home in hopes of getting a glimpse of her young daughter. On one occasion, in violation of a court order, she took her child because of her overwhelming yearning to be with her. Shortly thereafter, she turned herself into a women’s shelter with the child unharmed. Ms. Hair is paying the ultimate price for that desperate act, which she acknowledged was wrong.
The plan’s fourth, seventh, eighth, and the latter part of the sixth requirements concern parenting and require Ms. Hair to correct a behavior which, according to the facts in the record, she did not exhibit. In fact, there is no evidence in the record that she has not been a nurturing and caring parent toward both Mark and E.H. or that she has not maintained a relationship with them before the State took them from her. Additionally, there is no evidence that she has ever had a problem with positive discipline regarding her children or that she has ever demonstrated that she did not “understand[ ] her family situation and her role and responsibility.” Remember— E.H. has been described as “a happy, well-adjusted child” who does not suffer from “any serious problems,” and Mark, as college material, despite his physical and emotional infirmities. These infirmities were part of the enormous “baggage” he carried into the adoption by Ms. Hair. Thus, it is difficult to understand how anyone can conclude that Ms. Hair has not satisfied these provisions of the plan or that they even apply to her.
The plan’s fifth requisite states that she must “actively participate in psychiatric evaluation to determine the need for medication.” Much of what is expected of Ms. Hair regarding compliance with the plan is based on the State’s impression that she is psychotic and in need of medication. The State maintained this conjecture in spite of Dr. Murphy’s early determination that she was not psychotic, did not need medication, and was not a danger to herself or to her children, as well as the overwhelming body of medical evidence, that followed, supporting Dr. Murphy’s opinion.
11?At the April 23, 1996 “in need of care” adjudication, Dr. Boyer, whom Ms. Hair had visited regularly since 1982, stated that before receiving Dr. Murphy’s report, she “had never seen any evidence prior to that time of — even of depression or abnormal behavior.... I had never seen any paranoid behavior exhibited by Opal.” Yet, the State, which is not qualified to judge such matters, insisted that she see another psychiatrist and constructed a plan which assumed that she was psychotic, without providing for any other alternatives.
Ms. Hair refused to see OCS’ second psychiatrist. Nevertheless, she had already cooperated with the State’s first one, Dr. Murphy, and, before the termination hearing, she cooperated with two others, Drs. Anderson and Rathmell. Presumably, they were court appointed. The latter two evaluated her and determined that she was competent to stand trial for felony charges, which she had incurred when removing her daughter from the foster home. None of the three psychiatrists found that she had a psychosis or a need for medication. Dr. Anderson, who initially saw her in August 1998, met with her on six separate occasions, for a total of nine hours. He reported to the State and to the court that she is not delusional and is *766 not a threat to her children and questioned “what this lady was doing here.”
Further, presumably at the State’s behest, early on, Ms. Hair cooperated .with Dr. Post, a clinical psychologist. He is the only health care professional who positively diagnosed her as having a persecutor delusional disorder with a poor prognosis for recovery, even though the MMPI he administered to her indicated no psychosis, and in fact, demonstrated normality. He also acknowledged that he had failed to perform a more illustrative test for psychosis, the Rorschach. He based his opinion, that the court should terminate her parental rights, mainly, on two components. He believed Mark; he disbelieved Ms. Hair. Since he did not believe that her account of events was true,, he concluded that she was paranoid and delusional.
Regarding Dr. Post and his diagnosis of Ms. Hair, Dr. Anderson vehemently testified at the termination hearing that he believed that: ■ ■ •
Dr. Middleton’s report is a very strong report {Dr. Middleton found that Mark had a'psycho sexual type disorder.) that I think supports an alternative conclusion of the events that occurred. The fact that Dr. Post says that he doesn’t believe that this happened, well that’s Dr. Post’s — I don’t know whether that’s a person [sic] opinion or a professional opinion, but certainly there have been individuals sitting in this chair who have been accepted by the Court as an expert witness in l^cultish [sic] crimes or whatever who testified that Mark gave age inappropriate information that he should not have had at that age and that this investigator believed him.
[[Image here]]
Rorochach [sic] is a projective test for psychosis[.]
[[Image here]]
Which is what he says Opal has, and he never did a Rorochach [sic]. Where he initially said he did do one, and then he said, oop, I didn’t do one but it would have been helpful and his testimony here was that now it would not have been helpful. Well, I disagree with that. I’ve talked with other psychologists and they disagree with that. The MMPI was a normal MMPI. This supports a delusional disorder. No, I disagree with that. Her K-scale was elevated. That means she was defensive. Well, the lady is defensive. I can understand that. That was the only scale that was abnormal. Schizophrenia scale was not elevated, which is indicative of psychosis. Paranoid scale wasn’t elevated, which is indicative — it was a normal MMPI except for on the validity scales, you know. She was defensive for crying out loud. Well, that now supports a delusional disorder in Dr. Post’s testimony.
[[Image here]]

[T]he lady is not delusional and she’s not psychotic.

[[Image here]]
Dr. Post says she doesn’t have a thought disorder. She is psychotic and delusional but she doesn’t have a thought disorder or a broad disorder.... Thought disorders come in two forms, thought process, how she’s about to process her thoughts, is she logical and goal directed or is she tangential and over-inclusive and takes forever to get to a point. Well, she’s always been as goal directed as I can ... picture anyone being.... [T]here’s thought content and thought process. Thought process is the organization of thought. Thought content is does she have hallucinations, does she have delusions, suicidal ideation, homicide ideation.... To say that she’s got a delusional disorder but doesn’t have a thought disorder is— I cannot in any way, shape, or form understand that because that does not compute. To say that she is psychotic *767 but does not have a thought disorder does not compute.
(Emphasis added.)
With all due respect to Dr. Post in his field of clinical psychology, he is limited in his training and is not as qualified and competent concerning psychiatric disorders as psychiatrists. He is not qualified to treat psychotics nor is he authorized to prescribe 114medication, which he admits is the usual mode of treatment. Unlike Dr. Anderson, who is far more qualified in this field who more thoroughly evaluated Ms. Hair and in a timely fashion, Dr. Post saw her only once and for only one hour, and that was three years before the. termination of parental rights hearing. Not only was his evaluation irrelevant because of its untimeliness, but it was flawed because of its premises.
The first premise was that Ms. Hair was paranoid and delusional because he did not believe her and he believed Mark. This approach was defective for the reasons Dr. Anderson pointed out. Further, when determining whether someone is delusional, the issue is not whether that person’s belief is true. The issue is whether the belief has a rational basis. Ms. Hair’s beliefs, regarding sexual and satanic abuses, while perhaps not in our world of experience, did have a rational basis. A former law enforcement chaplain and satanic ritual expert — an independent third party brought in by law enforcement — investigated and validated them to the point that indictments were to be forthcoming. Chaplain Fleig has not been pronounced to be paranoid and delusional. Further, as Dr. Anderson noted, Dr. Middleton’s findings seem to support Chaplain Fleig’s findings. Additionally, if Dr. Post had gone beneath the surface- of Ms. Hair’s “stories,” he would have learned that there was also physical evidence to support some of the other events and that all of them had emanated from Mark, whom he had no problem believing. Ms. Hair had simply reiterated Mark’s account of his abuse and the FBI’s surveillance and persecution. Physical evidence includes Ms. Hair’s $10,-000.00, plus, telephone bills. They speak for themselves. They reveal multiple incidents of calls made from her house, on the same line, at the same time. That would cause anyone pause. To this day, it remains a mystery. Other unexplained physical evidence involves the vandalism of her car and home during her absence.
The second flawed premise is Dr. Post’s misplaced reliance on Mark. He saw him only once for one hour. He did not evaluate him. Mark had long-term, serious emotional problems before he began living with Ms. Hair. At the time he spoke with Dr. Post, the State had removed him from her home and, presumably, placed him in Dr. Stuart Samson’s care. Dr. Samson believed that Mark had a “Delusional disorder NOS vs Paranoid disorder vs Share delusional disorder , vs Thought disorder psychosis.” He referred him to Dr. George Middleton, a psychologist, who believed that he may have a Psycho Sexual Disorder. It is questionable that Dr. Post was even aware of Mark’s history or Drs. Middleton’s and Samson’s disturbing evaluations. Further, he apparently, |1Bnever attempted to verify Mark’s allegations. Instead, he took them at face value and used them as the basis for his opinion, which he provided to the court.
In summary, Dr. Post has inferior qualifications and competence in the field of psychiatry; he had a one-time, one-hour interview of Mark and Ms. Hair, three years before the termination hearing; he failed to administer to Ms. Hair an important diagnostic test; he took a normal MMPI and turned it into evidence of a psychotic disorder; he apparently lacked an.understanding of the elements comprising the diagnosis he provided; he failed to evaluate Mark or substantiate his “tales;” and he primarily relied dn Mark, whom the court deemed to be unreliable, to form'his opinion. An opinion, derived in this manner, hardly rises to the level of “clear and convincing ” evidence. However, the trial court- chose to accept it as' the basis for *768 terminating Ms. Hair’s parental rights, over the opinions of three other psychiatrists, whose testimonies warranted no suspicion, and against other overwhelming opposing evidence. Under any standard of proof, it was unreasonable for the trial court to terminate parental rights based on hearsay information which came from an individual whom the trial court, itself, believes is extremely manipulative and unreliable. Surely, this constitutes manifest error.
The following graphic, stunningly, demonstrates why the trial court committed manifest error in finding that Ms. Hair should have complied with OCS’s case plan and did not:
[[Image here]]
Reasonable Expectation of Significant Improvement
Article 1015, also, requires that the State prove, by clear and convincing evidence, that “there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future[.]” The legislature, apparently, meant improvement from “the parent’s condition or conduct” which gave rise to the State’s intervention. The State’s intervening concerns were based on a presumption of insanity. Thus, to prove that Ms. Hair’s mental health condition and conduct have no reasonable expectation of significant improvement, the State must present clear and convincing medical ev *769 idence to that effect from a competent health care provider.
Although Ms. Hair did not see a fourth psychiatrist, as the- State demanded, the record is replete with competent medical evidence, from eminently qualified psychiatrists, establishing that the State’s original assumption was groundless. (The only exception was Dr. Post’s opinion, which is fatally defective.) Nevertheless, the State would not let go of it. It appears that the only way that Ms.' Hair could have satisfied this provision, in the State’s mind, would have been for her to locate a psychiatrist who was 117willing to say that she is psychotic and who would prescribe medication, triggering other dormant case plan conditions for reunification.
The facts in the record establish that Ms. Hair was an exemplary parent with no abnormal mental condition, not in need of medication, and not a danger to her children. Therefore, there is nothing for her to improve, other than perhaps her attitude towards those who inappropriately kept her children away and denounced her as their parent.
Thus, the State failed to meet its burden of proof on this threshold requirement, as well. Accordingly, since clear and convincing evidence is required for both prongs of the 1015 ground for termination, the trial court committed manifest error when it granted the termination.
To support its affirmation that Ms. Hair is an unfit mother, mainly because she does not satisfy this prong of the test, the majority makes much of her not having “maintained a relationship with E.H.,” once the State became involved. It interprets this to mean that “she has no interest in improving her conduct and providing a stable home for her young daughter.” First, the majority’s application of the “improvement” standard appears misplaced, since, logically, the legislature must have intended “improvement” to relate to conduct prior to the State’s intercession. Notwithstanding, there were many obstacles to Ms. Hair’s visitation with her children after the State began its process. One of the barriers was that the State refused to allow visitation in a non-threatening location. Ms. Hair’s desire to shield her children from the negative experience of visiting with their mother in an area of the police station, which she believed was especially detrimental to Mark, hardly seems to indicate that “she has no interest in improving her conduct and providing a stable home for her young daughter.” Additionally, a major impediment to her being able to see her children was that she has spent much of her time in jail since the State removed them from her care:
1. Shortly after the State took E.H. on January 25, 1996, the trial court issued a restraining order, prohibiting Ms. Hair from going near the child’s foster home or school.
2. On August 6, 1996, she was held in contempt of court and jailed until such time as she would agree to cooperate with the State’s case plan. This incarceration lasted for more than four months.
3. In December of 1997, she removed E.H. from the foster parents’ house, in violation of the court order, and, shortly thereafter, was again incarcerated.
|1S4. She then remained in jail until the termination hearing in February of 1999. She testified that her bond was set in the millions.
Although her contempt of court and violation of a court order were wrong, the fact that Ms. Hair was incarcerated because of her despairing desire to be with her daughter hardly speaks of a mother who is not interested in maintaining a relationship with her daughter. and who cares more about herself than being with her child.
Her every act and omission have been placed under a microscope and given a negative spin. Every little peccadillo, such as her disagreement with Mark’s school, has become a sin for which she has been faulted. It is difficult to imagine a parent *770 who could survive this kind of assault. The State even seemed to blame her for Mark’s emotional problems, forgetting that they predated his adoption and that she, nonetheless, saw his potential and was willing and able to develop it into college material.
The State did not show by clear and convincing evidence that there was no reasonable expectation of significant improvement, as the State did not establish in the first place that there was a ground which necessitated significant improvement.
Mental Illness Related to Ms. Hair’s Parenting Ability
In the case sub judice, Ms. Hair did not have to carry the burden of proving her fitness as a parent in order to avoid termination of her parental rights; nevertheless, the clear and convincing factual evidence in the record reflects that she is not mentally ill. But even assuming the existence of such a deficiency, nothing in the record proves that it has affected her parenting abilities.
“Mental illness” is defined in La.Ch. Code. art. 1003 as “a psychiatric disorder which has substantial adverse effects on a parent’s ability to function and which requires care and treatment as determined by a psychiatrist or psychologist.” The record is overweighted with evidence showing that she is an excellent parent. There is no competent evidence to say that she is unfit or that her parenting is affected in any way by a mental deficiency. Accordingly, based on Article 1015’s requirements, again, the trial court manifestly erred when it divested her of her parental rights on this ground.
Other manifest errors, related to mental illness impacting parenting, concerned the trial court’s approval, continued endorsement, and ultimate application of the State’s case plan — a case plan which was incomplete, contained no reliable factual support for impressions and conclusions, was based on groundless supposition and untrustworthy | ^information, contained misrepresentations, and did not meet the legal mandates of reducing and removing barriers. Some examples of the deficiencies include:
1. Most of the State’s concerns relate to the child’s fear of seeing her mother. The only supporting evidence, which the State offered of this is that E.H. ran away from Ms. Hair at some time during a scheduled visit when she raised her voice at OCS workers. Without knowing more, this fact means nothing. There could be many explanations for E.H.’s behavior, and nothing was provided, other than, again, the State’s unsupported spin. Moreover, its interpretation does not ring true in light of the characterization of E.H. under Ms. Hair’s care before the State’s intervention. E.H. was described as a happy, well-adjusted child, with no serious problems. This betrays an interpretation that she feared her mother.
2. Much of the State officials’ testimonies were based on unsupported hearsay.
3. There is no evidence, other than Mark’s unsubstantiated statements, that Ms. Hair’s “irrational” behavior had any effect on her willingness, ability, and desire to care for her children.
4. The State represented that it had complied with the plan and that Ms. Hair had not done so in any way, neither of which is accurate.
Other Facts vs. “Impressions”
There are several events which the State used to support its position that, indeed, Ms. Hair is “crazy.” Again, when one looks beyond the surface impression at the facts, the adverse impression evaporates.
*771 $10,000 Telephone Bill
Ms. Hair claims that the FBI bugged her phone, causing her to incur telephone bills in excess of $10,000.00 during the spring of 1995. This allegation appears to be irrational, even delusional. However, the fact is that those telephone bills are filed into the record. Oddly, their details reveal superimposed long distance calls; that is, multiple calls which were made at the same time from the same telephone line. The trial court, although admitting that it “could not prove it,” stated that it believed that Mark had made all of the telephone calls. Irrespective of how the billings were incurred, the fact remains that they exist and that any reasonable person, under the same circumstances, could become suspicious, specifically, in light of the enormous amount and evidence of | ^superimposed calls. It seems impossible that, normally, two calls could be made on the same line, at the same time. Again, this has never been rebutted nor has it been explained how it happened or could have happened.
Cowboy
Cowboy was Mark’s best friend, although significantly older. He testified that Opal Hair harassed him and asked him to be her children’s father. His father admitted during trial that his son is, in essence, mentally retarded.
The Hatchet Incident
Three OCS workers met outside of Ms. Hair’s house on January 25, 1996. Ms. Hair refused to let them in. The filter through which these workers assessed the situation was an unspecified, anonymous complaint that Ms. Hair was feared to be insane. They thought that they saw her carrying a hammer or a hatchet. This triggered most of their impression that they were faced with some kind of standoff. Accordingly, they called the police. This event triggered Mark’s and E.H.’s removal from Ms. Hair’s custody.
The record reflects that the OCS workers’ impression was erroneous. In fact, Ms. Hair, as corroborated by her mother, explained that she was gardening in her backyard when the OCS workers rang her door bell. She had been chopping brush with a little, Boy Scout hatchet. She came to answer the door, and as she attempted to close the window shades so that the OCS workers could not see inside the house, she placed the hatchet near the door.
Mark’s FBI Harassment
All of the other problems, which Ms. Hair claimed to be a result of FBI harassment, were reported to her by Mark. She said that, instead of immediately believing Mark she always searched for an alternative reasonable explanation. Unrebutted facts in the record reflect that Ms. Hair’s car, as well as the windows of the apartment complex in which she resided, were vandalized. Every occurrence arose while she was absent, and Mark explained them as FBI persecution.
Additionally, Mark told his mother that FBI agents paid other children at school to beat him. up and harass him, that he had proof that Cowboy was an FBI agent, and that when he was in Cowboys’ bedroom, he could hear events occurring in her apartment hi from Cowboy’s computer. Apparently, he reported an incident to her which had happened in her apartment at a time when he was not present and could not possibly, otherwise, have known had occurred.
When analyzing these facts, it is striking that none of the alleged FBI harassment concerned Ms. Hair directly or any other member of her family, except Mark. And, as mentioned above, a thought, though untrue, does not rise to the level of a delusion if it has a factual basis. In this case, Dr. Post found Ms. Hair to be delusional, yet he based his opinion on his disbelief that any of these mentioned facts occurred. His disbelief is clearly and undoubtedly erroneous from the face of the record and the physical evidence.
*772 And finally, before faulting Ms. Hair, as the trial court did, for believing her son, it should be remembered that a professional, trained in the field of satanic ritual abuse also, believed Mark’s reports.
CONCLUSION
This case is like an onion. When the layers of “impressions” are peeled away, what is left is little more than a tug of war between wills and personality clashes. To a large degree, the State brought these difficulties on itself and the trial court. It made invalid assumptions about Ms. Hair, which the court sanctioned, and which it refused to change when presented with competent contrary evidence. Although it is evident that Ms. Hair did not cooperate with OCS to the fullest extent, equally obvious is OCS’ refusal to address her legitimate concerns or even attempt to reduce the barriers to family reunification. The case sub judice presents an extremely rare situation in which the integrity of OCS, the very device, which the State normally utilizes to protect distressed children’s interest, is called into serious question, not only by Ms. Hair, but also by a credible independent third party. Accordingly, it was unreasonable to expect Ms. Hair to comply with its demands at all. Moreover, the State had the paramount duty to design a realistic and reasonable plan which had a chance of accomplishing the mandated goal of reunification. Instead, it fashioned a rigid plan, which was inappropriate to the situation and which Ms. Hair was bound to fail. Then, it dug in its heels. It refused to abide by its mandate to remove or reduce barriers to the plan so that all parties could achieve the goal, which La.Ch.Code art. 101 requires, when it states:
122The people of Louisiana recognize the family as the most fundamental unit of human society; that preserving families is essential to a free society; that the relationship between parent and child is preeminent in establishing and maintaining the well-being of the child; that parents have the responsibility for providing the basic necessities of life as well as love and affection to their children; that parents have the paramount right to raise their children in accordance with their own values and traditions; that parents should make the decisions regarding where and with whom the child shall reside, the educational, moral, ethical, and religious training of the child, the medical, psychiatric, surgical, and preventive health care of the child, and the discipline of the child; that children owe to their parents respect, obedience, and affection; that the role of the state in the family is limited and should only be asserted when there is a serious threat to the family, the parents, or the child; and that extraordinary procedures established by law are meant to be used only when required by necessity and then with due respect for the rights of the parents, the children, and the institution of the family.[8]
For a judgment of termination of parental rights to be justified under Article 1015, the State must prove, by clear and convincing evidence, that Ms. Hair is unfit AND did not substantially comply with the plan; AND that “there is no reasonable expectation of significant improvement in [her] condition or conduct in the near future[.]” The State did none of this. Yet, we have deprived a parent of her most basic right — the right to rear her own child. We have deprived a young child of her greatest need — the love, care, and support of her parent. We have done so with minimum safeguards as to how the evidence was derived and developed, beginning with the child in need of care proceeding, through the termination hearing.
Throughout this four-year nightmare, Ms. Hair may not have demonstrated an amiable personality to those who had tak *773 en away her children, and. who, she suspected, had abused one- of them in the most heinous way, and to the trial court who, in her mind, seemed to-be on their side, condoning what they had done. She has shown her contempt for the court and violated a court order. She was punished for both. But there is no clear and convincing evidence that she has not been, and cannot be, a good mother to E.H. The evidence is that she has not worked well with OCS. It is for this that she and her child are being severely punished. However, irreverence is not a ground' for dispossessing her of-her constitutional parental mantle.
| ^According to Drs. Anderson and Boyer, Ms. Hair was under extreme stress, not of her own making. If, indeed, reunification of the family is the goal, personalities should have been put aside, for the children’s sake, if nothing else. She should have been helped to succeed, not doomed to failure.
The system has failed Ms. Hair and her children, miserably. We should make it right. An AFFIRMATION is an invitation for more of the same in future cases.

. 96-1198 (La.App. 3 Cir. 11/6/96); 682 So.2d 887, 890.

. Reinhardt v. Reinhardt, 97-1889 (La.App. 1 Cir. 9/25/98); 720 So.2d 78, 79.

. State in the Interest of J.A., 99-2905 (La. 1/12/2000); 752 So.2d 806.

. State in The Interest of J.A., 99-2905 (La. 1/12/2000); 752 So.2d 806.

. Id.

. La.Ch.Code art. 101, et seq.

. This is where the "icee” incident took place.

. La.Ch.Code art. 101.